**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Gloria Ward,<br><br>    Plaintiff,<br><br>v.<br><br>Commissioner of Social Security Administration,<br><br>    Defendant. | No. CV-21-08029-PCT-GMS<br><br>**ORDER** |

Plaintiff Richard Ward seeks review under 42 U.S.C. § 405(g) of the final decision of the Commissioner of Social Security ("the Commissioner"), which denied him disability insurance benefits and supplemental security income under sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act ("SSA"). Because the decision of the Administrative Law Judge ("ALJ") is supported by substantial evidence and is not based on legal error, the Commissioner's decision is affirmed.

## BACKGROUND

Richard Ward ("Mr. Ward"), the original Plaintiff in this case, was born in April 1968. He graduated high school and attended community college. Mr. Ward worked one day in September of 2011. His previous date of employment was January 10 or 11, 2011. ("Administrative Record - Doc. 17" or "AR" 45.) He was employed at Driftwood Dairy as a filler operator "running the machines that fill the packages of milk . . . bottles would

go in, be filled, capped, and . . . hand case them." (AR 47.) Mr. Ward later worked as a material handler to "move pallets of unused cartons to the machines for the operators to run the machines … stack and palletize boxes of product." (AR 46-47.) His impairments include left wrist scapholunate ligament tear with associated Kienbock's disease status post left wrist arthrodesis, obesity, bilateral shoulder impingement, a major depressive disorder and an anxiety disorder. (AR 20.)

On March 3, 2015, Mr. Ward applied for disability insurance benefits. He also applied for supplemental security income on March 6, 2015. Both applications alleged disability beginning May 24, 2013. These claims were denied on October 28, 2015, and upon reconsideration on March 25, 2016. Mr. Ward filed a written request on April 26, 2016, for a hearing. On August 9, 2017, he appeared with his attorney and testified at a hearing before the ALJ. A vocational expert also testified. (AR 16.) On December 22, 2017, the ALJ issued a decision that Mr. Ward was not disabled within the meaning of the Social Security Act. (AR 28.) The Appeals Council denied Mr. Ward's request for review of the hearing decision on May 17, 2018. Mr. Ward sought review in the Central District of California, and the District Court reversed and remanded for further proceedings. (AR 1345.) The Appeals Council remanded to an ALJ for proceedings consistent with the District Court's order. (AR 1271.) On remand, ALJ Patricia Bucci heard and decided the case, and after conducting an oral hearing on September 14, 2020, she issued an unfavorable decision on November 14, 2020. The Appeals Council did not invoke review and the ALJ decision became the final decision of the Commissioner of January 13, 2020. On February 12, 2021, Mr. Ward sought review by this Court. (Doc. 1.)

During the proceedings in this Court, Mr. Ward filed a Motion for Summary Judgbment in lieu of an opening brief. The Court nevertheless treats the Motion for Summary Judgment (Doc. 20) as the Opening Brief pursuant to the local rules and treats the Response and Reply to the Motion for Summary Judgment as the Answering Brief and Reply Brief, respectively. L.R.Civ. 16.1(a)-(c). Additionally, on June 18, 2022, Mr. Ward passed away

and the Court granted his surviving spouse, Gloria Ward, permission to substitute as a party. (Docs. 27, 29.)

**DISCUSSION**

**I.     LEGAL STANDARD**

The district court reviews only those issues raised by the party challenging the ALJ's decision. *See Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001). Claims that are not actually argued in an appellant's opening brief are not considered on appeal. *Indep. Towers of Washington v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003). Only issues that are argued specifically and distinctly in a party's opening brief are reviewed. *Id.* Moreover, "when claimants are represented by counsel, they must raise all issues and evidence at their administrative hearings to preserve them on appeal." *Meanel v. Apfel*, 172 F.3d 1111, 1115 (9th Cir. 1999). Failure to do so will only be excused when necessary to avoid a manifest injustice. *Id.*

A court may set aside the Commissioner's disability determination only if the determination is not supported by substantial evidence or is based on legal error. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). Substantial evidence is more than a scintilla, less than a preponderance, and relevant evidence that a reasonable person might accept as adequate to support a conclusion considering the record as a whole. *Id.* In determining whether substantial evidence supports a decision, the court must consider the record as a whole and may not affirm simply by isolating a "specific quantum of supporting evidence." *Id.* Generally, when the evidence is susceptible to more than one rational interpretation, courts must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record. *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012). "Overall, the standard of review is highly deferential." *Rounds v. Comm'r Soc. Sec. Admin.*, 807 F.3d 996, 1002 (9th Cir. 2015).

Additionally, harmless error principles apply in the Social Security Act context. *Molina*, 674 F.3d at 1115. An error is harmless if there remains substantial evidence supporting the ALJ's decision and the error does not affect the ultimate non-disability

determination. *Id.* The claimant usually bears the burden of showing that an error is harmful. *Id.* at 1111.

## II. FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To determine whether a claimant is disabled for purposes of the Social Security Act, the ALJ follows a five-step process. 20 C.F.R. § 404.1520(a). The claimant bears the burden of proof on the first four steps, but the burden shifts to the Commissioner at step five. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, the ALJ determines whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If so, the claimant is not disabled, and the inquiry ends. *Id.* At step two, the ALJ determines whether the claimant has a severe medically determinable physical or mental impairment. § 404.1520(a)(4)(ii). If not, the claimant is not disabled, and the inquiry ends. *Id.* At step three, the ALJ considers whether the claimant's impairment or combination of impairments meets or medically equals an impairment listed in Appendix 1 to Subpart P of Part 404; 20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is automatically found to be disabled. *Id.* If not, the ALJ proceeds to step four. At step four, the ALJ assesses the claimant's residual functional capacity and determines whether the claimant is still capable of performing past relevant work. § 404.1520(a)(4)(iv). If so, the claimant is not disabled, and the inquiry ends. *Id.* If not, the ALJ proceeds to the fifth and final step, where he determines whether the claimant can perform any other work based on the claimant's residual functional capacity ("RFC"), age, education, and work experience. § 404.1520(a)(4)(v). If so, the claimant is not disabled. *Id.* If not, the claimant is disabled. *Id.*

At step one, the ALJ found that Mr. Ward met the insured status requirements of the Social Security Act through December 31, 2016, and that he had not engaged in substantial gainful activity since May 24, 2013. At step two, the ALJ found that Mr. Ward had the following severe impairments: left wrist scapholunate ligament tear with associated Kienbock's disease status post left wrist arthrodesis, obesity, bilateral shoulder impingement, a major depressive disorder and an anxiety disorder, not otherwise specified.

(AR 20.) At step three, the ALJ determined that Mr. Ward did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

At step four, the ALJ found that Mr. Ward retained the residual functional capacity to lift and carry 20 pounds occasionally, 10 pounds frequently, standing and walking for 6 hours during an 8-hour workday, and sitting for 6 hours. The claimant was limited to occasional climbing ropes, ladders and scaffolds, as well as reaching bilaterally overhead. Mentally, Mr. Ward was limited to simple routine tasks with only occasional contact with coworkers, supervisors and the general public. (AR 21.) The ALJ further found that he was unable to perform any of his past relevant work. (AR 26.)

At step five, the ALJ concluded that, considering Mr. Ward's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that he could perform. In this case, Plaintiff takes issue only with the ALJ's conclusion at step five and raises a constitutional challenge to the ALJ's decision outside the scope of the five-step determination.

## III. ANALYSIS

### A. Step Five: Conflict Between DOT and Vocational Expert Testimony

Plaintiff's challenge to the ALJ's step five determination based on an alleged conflict between the Dictionary of Occupational Titles ("DOT") and Vocational Expert ("VE") testimony is denied. When the ALJ determines that the claimant cannot perform past relevant work at step four, she proceeds to step five to determine whether the claimant is able to do any other work that exists in "significant numbers" in the national or local economies. *See* 20 C.F.R. §§ 404.1520, 416.920. This determination considers the claimant's RFC, age, education, and work experience. *Id.* At step five, the ALJ has the "limited burden" to establish the availability of other work that the claimant can do; however, the ultimate burden of proving a disability remains with the claimant. *Barrios v. Berryhill*, No. CV 16-3984, 2017 WL 1423705, at *3 (C.D. Cal. Apr. 20, 2017).

"The ALJ may call upon a VE at step five to testify about whether, given the claimant's RFC, there are other jobs that the claimant could perform." *Id.* at *4.  In doing so, the ALJ may ask the VE hypothetical questions that set forth the claimant's RFC.  If the hypothetical is complete and supported by substantial evidence, the ALJ may rely on the VE's testimony.  *Id.*  Importantly, however, if the VE's testimony about a particular job deviates from the description of that job in the DOT, the ALJ has an affirmative duty to ask the VE to explain the conflict.  *Id.*; *Rounds*, 807 F.3d at 1003.  If the explanation is reasonable, the ALJ may still rely on the VE's testimony.  However, failure "to recognize that a VE's testimony conflicts with the DOT, or failure to adequately and reasonably explain the conflict, may be grounds for a remand if the conflict was not harmless." *Barrios*, 2017 WL 1423705, at *4; *Rounds*, 807 F.3d at 1004.

Here, the ALJ found that Ward could perform simple light work that involved "understanding, remembering and carrying out simple instructions" and could "work with occasional routine changes in the work setting." (AR 1252.)  The ALJ further found that Ward was still able to perform three occupations, namely a machine operator, production assembler, and bench worker.  (AR 1258-59.)  Each of these occupations requires the ability to perform Level 2 Reasoning on the Department of Labor's General Education Development scale, which is defined as the ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and "[d]eal with problems involving a few concrete variables in or from standardized situations." DICOT Appendix C, https://www.dol.gov/agencies/oalj/PUBLIC/DOT/REFERENCES/DOTAPPC.  By contrast, Level 1 Reasoning requires only the ability to "[a]pply commonsense understanding to carry out simple one- or two-step instructions" and "[d]eal with standardized situations with occasional or no variables in or from these situations encountered on the job." *Id.*

The crux of Plaintiff's argument is that an apparent conflict exists between the claimant's ability to "work with occasional routine changes in the work setting," as set out by the ALJ, and the Level 2 Reasoning's criterion of "dealing with problems involving a

few concrete variables in or from standardized situations." (AR 1252); DICOT Appendix C. However, "[f]or a difference between an expert's testimony and the *Dictionary's* listings to be fairly characterized as a conflict, it must be obvious or apparent." *Gutierrez v. Colvin*, 844 F.3d 804, 808 (9th Cir. 2016). "This means that the testimony must be at odds with the *Dictionary's* listing of job requirements that are essential, integral, or expected." *Id.*

At the outset, Plaintiff has not clearly presented a conflict between the VE's testimony and the DOT description of job responsibilities. She highlights the fact that "occasional routine changes" is not equivalent to "a few concrete variables." While the language in the ALJ's limitation and the DOT are not identical, they do not necessarily conflict. Plaintiff asserts that the descriptor "occasional routine changes" deals with frequency of discrete tasks while "a few concrete variables" deals specifically with the number of different variables involved in any given task. This may be the case, but it does not present a conflict. In other words, a claimant who is incapable of dealing with changes in the work environment any more frequently than "occasionally" is not necessarily precluded from dealing with "a few concrete variables."

The case *Kelly P. v. Saul* is comparable. No. 5:18-cv-00777, 2019 WL 3573591, at *5 (C.D. Cal. Aug. 6, 2019). In that case, the Court found no obvious or apparent conflict between the Level 2 Reasoning requirement of "a few concrete variables" and the ALJ's limitation of "minimal changes in the workplace setting or routine." *Id.* Here, it seems the difference between "occasional" changes and "minimal" changes is negligible. Occasional means "infrequently and irregularly," while minimal means "of a minimum amount, quantity, or degree; negligible." *Occasional,* Merriam Webster (2023); *Minimal*, Merriam Webster (2023). Thus, while "minimal" may actually reference the number of variables, as the DOT description does, "occasional" appears even less in conflict with the "few concrete variables" requirement because it deals with a different measure, that is, frequency. As such, there is no facial conflict.

Nevertheless, Plaintiff raises a more nuanced argument. She asserts that a conflict exists because the phrase "occasional routine changes" aligns more closely with Level 1 Reasoning than Level 2 Reasoning. More specifically, because the DOT describes Level 1 Reasoning as the ability to "[d]eal with standardized situations with occasional or no variables in or from these standard situations," Plaintiff alleges that the term "occasional" must be consistent with Level 1 Reasoning here. For this proposition, she relies on *Zavalin v. Colvin* and *Rounds v. Commissioner*.

In *Zavalin*, the Court found "a conflict between the residual functional capacity to perform simple, repetitive tasks, and the demands of Level 3 reasoning."[1] 778 F.3d 842, 847 (9th Cir. 2015). It found the conflict to "be plain when [it] consider[ed], side-by-side the definitions of Level 2 and Level 3 Reasoning." *Id.* After evaluating the definitions, the Court determined that Level 2 and Level 3 Reasoning were at least equally consistent with the claimant's limitation, meaning the ALJ failed to recognize an apparent inconsistency. *Id.* Similarly, in *Rounds*, the Court analyzed whether an apparent conflict existed between the RFC limitation to "one and two step tasks" and the Level 2 standard of carrying out "detailed but uninvolved written or oral instructions." 807 F.3d at 1002. The Court noted that the Level 1 Reasoning level is defined as the ability to "carry out simple one- or two-step instructions." *Id.* It found that an apparent conflict existed because "[o]nly tasks with more than one or two steps would require 'detailed' instructions. And these are precisely the kinds of tasks Rounds' RFC indicates she cannot perform." *Id.* at 1003.

These cases demonstrate that courts look to the definitions of various Reasoning Levels to help determine if the ALJ's limitation corresponds to a different Reasoning Level than the VE's testimony. However, they do not mechanically match words from the ALJ's limitation to a given Reasoning Level. Here, the fact that the ALJ used the phrase "occasional routine changes" in her limitation does not automatically limit Mr. Ward to

---

[1] Level 3 Reasoning requires individuals to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations." *Zavalin*, 778 F.3d at 847.

Level 1 Reasoning jobs simply because the Level 1 Reasoning definition uses the word "occasional." The ultimate question is, as noted above, whether a person who is limited to only dealing with "occasional routine changes" is precluded from carrying out the functions of a job that may require dealing with "a few concrete variables."

The Court cannot say that a limitation to dealing with occasional changes and an ability to handle a few variables are inconsistent. Although Plaintiff highlights a case in which a "few frequent changes" was consistent with Level 2 Reasoning, she does not demonstrate that "occasional changes" is inconsistent with Level 2 Reasoning. *Kelsey v. Berryhill*, No. 6:16-cv-01253, 2017 WL 3218072, at *4 (D. Or. July 27, 2017). Additionally, the limitation contained a provision that the Plaintiff could carry out "simple instructions," which both parties agree is compatible with Level 2 Reasoning. When paired with the limitation to "occasional routine changes," the Court cannot say that the limitation is intended to convey exclusively Level 1 Reasoning. To the contrary, the first part of the limitation falls squarely within Level 2 Reasoning and the second part of the limitation is not incompatible with Level 2 Reasoning. Thus, the ALJ's acceptance of the VE's testimony was appropriate and does not cause the determination to fall below the substantial evidence bar.

### B. Step Five: VE Methodology

Plaintiff next challenges the ALJ's reliance on the VE's testimony about the number of available jobs in the national or local economies. The challenge is denied because the testimony was reliable and constituted substantial evidence to support a finding that significant numbers of jobs were available to Mr. Ward. As noted above, when determining whether a claimant is disabled at step five, the ALJ may rely on testimony from a VE. *Lockwood v. Comm'r Soc. Sec.*, 616 F.3d 1068, 1071 (9th Cir. 2010). "Due to their specialized knowledge, the [Social Security Administration] recognizes VEs as a 'reliable source of occupational information in the evaluation of disability claims.'" *Kilpatrick v. Kijakazi*, 35 F.4th 1187, 1192 (9th Cir. 2022). "[E]ven without significant testing, a factfinder may conclude that [VE] testimony has sufficient indicia of reliability

to support a conclusion about whether an applicant could find work." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1157 (2019).

The Ninth Circuit has held that "absent contrary evidence, a VE's testimony is inherently reliable and sufficient by itself to support an ALJ's step-five finding." *Rashidi v. Kijakazi*, No. 22-55121, 2022 WL 17974638, at *1 (9th Cir. Dec. 28, 2022) (quoting *Ford v. Saul*, 950 F.3d 1141, 1160 (9th Cir. 2020)) (internal quotations omitted). The Court has regularly and recently rejected challenges to an ALJ's step five finding based on the VE's cursory explanation of methodology. *See, e.g.*, *Rashidi*, 2022 WL 17974638, at *2; *Ford*, 950 F.3d at 1159 (upholding a VE's testimony when the expert could not identify specific sources relied on and only listed general sources used and stating that he "typically average[d]" once a year). "Thus, though an applicant may probe the strength of the testimony by asking the expert about (for example) her sources and methods to assess whether the testimony is feeble or contradicted, under *Ford*, the cursory nature of the VE's explanation of her methodology, alone, did not render her testimony unreliable." *Rashidi*, 2022 WL 17974638, at *1.

Here, the VE identified three jobs that the claimant could perform and testified that the jobs existed in significant numbers in the national economy. The VE's qualifications include: operating a private practice for vocational rehabilitation counseling, certification in the United States Department of Labor Office of Workers Compensation Program, testimony in over 14,000 ALJ hearings, and over 40 years in the vocational counseling field. (AR 1945-49.) When asked how he produced the numbers for the available jobs, the expert testified that he used a composite of statistics from Bureau of Labor statistics, DOL publications, employment statistics quarterlies, and considered the continuum of the labor market. (AR 1297.) The expert did not share the specific underlying data from the sources that he consulted. (AR 1298.) When cross examined about his specific methodology, the expert explained that his methodology is a composite of the statistics, and he could not provide a more specific rundown of the criteria. (AR 1298.) Mr. Ward presented competing job numbers, arguing that the consideration of industry reduced the

number of available jobs for the occupations that the VE selected. The ALJ considered and rejected Mr. Ward's proposed numbers. (AR 1259.)

Any challenge to the VE's qualifications or expertise falls short. While a claimant may challenge a VE's underlying qualifications, here the VE possesses significant qualifications. He possesses over 40 years of experience in the field of vocational career counseling, has testified in over 14,000 administrative hearings, and has engaged in continuing education for decades. (AR 1945-49.) This expertise alone is arguably enough to overcome Plaintiff's argument as to whether his methodology is reliable. *Bayliss*, 427 F.3d at 1218 (stating that no additional foundation beyond the VE's expertise is required).

Nevertheless, the Ninth Circuit has recognized that "a VE's otherwise qualified and trustworthy testimony can be challenged if contradicted by evidence in the record." *Rashidi*, 2022 WL 17974638, at *2. Here, Plaintiff attempted to contradict the VE's job-numbers testimony by submitting a letter to the ALJ containing several data points that differed from the VE's testimony. (AR 1950.) Plaintiff primarily relied on a source called Job Browser Pro ("JBP") and argued that JBP double counts several thousand jobs within the overarching SOC code that the VE identified. The ALJ found that Plaintiff did not establish that his numbers were based on a reliable methodology and his argument that his numbers illustrated that the VE's were erroneous was "specious at best." (AR 1259.)

The Ninth Circuit has held that "an ALJ need only resolve job-number inconsistencies if the 'competing job numbers . . . constitute significant probative evidence.'" *White v. Kijakazi*, 44 F.4th 828, 836 (9th Cir. 2022) (quoting *Kilpatrick*, 35 F.4th at 1194). Significant probative evidence is "competing evidence" that is "too striking to be ignored." *Kilpatrick*, 35 F.4th at 1194. Plaintiff's proffered evidence does not appear to be such evidence. It is unclear what methodology or expertise Plaintiff relies on, and Plaintiff's data shows, at best, that different approaches may lead to different results. *See id.* (finding claimant's attorney's competing data unpersuasive because "[Plaintiff's] attorney did not replicate the VE's same methodology" and "[i]t is thus not surprising that [Plaintiff's] different approach led to different results). In any event, even if Plaintiff's

proffered data constituted "significant probative evidence," the ALJ addressed the rebuttal evidence. The ALJ critiqued the evidence because it was unclear what methodology Plaintiff's counsel used and described the proffered evidence as "specious." Because the Plaintiff's proffered evidence is not based on a reliable or similar methodology as the VE, and the ALJ addressed it, the Court cannot say that the competing data renders the VE's evidence unreliable or untrustworthy.

The only remaining argument, then, is Plaintiff's argument that the VE failed to adequately articulate his methodology. Plaintiff relies on *Biestek* for the standard under which to evaluate the VE's testimony. In *Biestek*, the Supreme Court rejected the argument for a categorical rule that a VE's testimony is unreliable when he does not provide his underlying data when asked for it. 139 S. Ct. at 1157. Plaintiff alleges that the "controlling standard" comes from a hypothetical in the *Biestek* opinion, which articulates several attributes of VE testimony which may overcome a failure to turn over underlying data. *Id.* at 1155 (including factors such as "amassing specific information about . . . labor needs and employment of people with disabilities" and "answer[ing] cogently and thoroughly all questions put to her by the ALJ and the applicant's lawyer"). *Biestek*, however, does not provide a checklist of factors that must be met to render a VE's testimony reliable. Instead, it emphasizes that the determination is case by case, and while in some cases "a different (maybe less qualified) expert failing to produce [underlying] data might offer testimony that is so feeble, or contradicted, that it would fail to clear the substantial-evidence bar," in other cases a failure to produce such data will not. *Id.* at 1155-56.

Post-*Biestek*, the Ninth Circuit has not adopted a standard requiring the VE to provide an in-depth explanation of his methodology. In *Rashidi v. Kijakazi*, the Ninth Circuit rejected an argument that a VE's testimony was insufficient because she failed to identify a reliable methodology. 2022 WL 17974638, at *1. On cross examination, the VE was "unable to clearly list the names of sources for the numbers she cited; she just referred to the 'DOT,' the 'US Bureau of Labor statistics,' and '*Occupational Employment Quarterly*' as sources she generally used." *Id.* When asked about her specific methodology

for calculating numbers, "the VE's answers were vague and not substantive," and she stated that she referred to publications, "[did a] validation of statistics of physical limitations," and "basically figure[d] out where the numbers come from and estimate all that." *Id.* The Court emphasized that the "cursory nature of the VE's explanation of her methodology, alone, did not render her testimony unreliable." *Id.*

In this case, the VE's testimony was similar to that of the VE in *Rashidi*. Like in *Rashidi*, the VE testified to using DOT codes, testified as to the proper SOC code for the jobs, and testified to using employment statistic quarterlies. He did not provide any more in-depth information as to how he acquired the numbers. Also like in *Rashidi*, the VE testified that his process for arriving at the numbers involved compiling statistics from several sources and continually reviewing surveys. While the VE's testimony as to his methodology could fairly be characterized as vague and would likely be strengthened by a more thorough explanation or provision of his underlying data, neither is required to clear the substantial evidence bar. Because this case is akin to *Rashidi*, which came after *Biestek* and accepted the VE's testimony as sufficient, the Court cannot say that the VE's testimony is unreliable such that the ALJ's reliance on it fails to meet the substantial evidence standard. As such, Plaintiff's challenge to the ALJ's step five determination is denied.

**C.  Separation of Powers**

Lastly, Plaintiff's separation of powers argument fails because she does not show a nexus between the potential unconstitutionality of Commissioner Saul's appointment and the adverse decision by the ALJ. A recent Supreme Court case, *Collins v. Yellen*, suggests that Commissioner Saul held his office unconstitutionally between June 17, 2019, and July 11, 2021, because he was dischargeable only for cause.[2] 141 S. Ct. 1761 (2021). Such a removal provision violated constitutional separation of powers by improperly restricting

---

[2] While the *Collins* case dealt with the Recovery Act's restriction on the President's power to remove the FHFA director, a nearly identical provision exists in the Social Security Act, 42 U.S.C. § 902(a)(3), and the Office of Legal Council has since issued an opinion finding the removal provision in the Social Security Act constitutionally unenforceable. Office of Legal Counsel, *Constitutionality of the Commissioner of Social Security's Tenure Protection*, 2021 WL 2981542, at *10-11 (July 8, 2021).

the President's power to remove the individual and "concentrating power in a unilateral actor insulated from the President's control." *Collins*, 141 S. Ct. at 1783-84.

In *Collins*, however, the Court emphasized that the unconstitutional removal provision does not automatically result in retrospective relief. Instead, the Plaintiff needed to demonstrate that the unconstitutional removal provision in fact caused compensable harm. *Id.* at 1788-89. For example, in that case the Plaintiffs argued that "[w]ere it not for that [unconstitutional removal] provision . . . the President might have replaced one of the confirmed Directors who supervised the implementation of the [amendment that harmed them]" or "a confirmed Director might have altered his behavior in a way that would have benefitted [Plaintiff's]." *Id.* at 1789.

Here, assuming Commissioner Saul held the position under an improper removal restriction, Plaintiff falls far short of showing a nexus between the Commissioner's unconstitutional removal restriction and the ALJ's unfavorable decision. Unlike in *Collins*, Plaintiff does not allege that absent the removal provision, then-President Trump would have been inclined to remove Commissioner Saul from his position. Without any allegation that the President's inability to remove the Commissioner was the cause of Plaintiff's unfavorable decision, it is unclear what nexus exists between the unconstitutional provision and the decision.

Moreover, in this case as compared to *Collins*, there is another degree of separation between the decisionmaker and the removal provision. Plaintiff does not take issue with a decision by Commissioner Saul, but rather a decision by a properly appointed ALJ and the Social Security Appeals Council. She makes no showing that the President's inability to remove the Commissioner somehow tainted the ALJ's decision or the Appeals Council's denial of review of the specific claim. In *Collins*, the Court gave specific examples of facts that may establish such a causal link, including if "the President had attempted to remove a Director but was prevented from doing so by a lower court decision holding that he did not have "cause for removal" or if "the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the

Director if the statute did not stand in the way." *Id.* at 1789. Plaintiff's general allegation "[t]he pertinent decisional facts occurred under an unconstitutional delegation of authority" does not establish any comparable causal link. (Doc. 20 at 15.)

Plaintiff also appears to allege that the two-layered removal scheme in the SSA adds another defect to the ALJ's decision. A two-layered removal scheme is one in which the ALJ is insulated from removal by two layers of "for cause" employment protection. *Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1126 (9th Cir. 2021). The Court need not explore whether such a removal scheme under the SSA is unconstitutional because Plaintiff again fails to establish the requisite nexus between the removal scheme and the ALJ's decision. The only argument Plaintiff advances on this point is that "Commissioner Saul was not removable at the pleasure of the President making his delegations to the ALJ in this matter constitutionally inform lacking sufficient oversight as an Article II adjudicator." (Doc. 20 at 16.) This argument fails to meet the standard that the Supreme Court has established and the Ninth Circuit has reiterated: "[t]he key . . . is demonstrating that the unconstitutional provision actually caused the plaintiff harm." *Decker Coal Co.* at 1137. Simply highlighting that there is a two-layer removal system at work does not establish the causal link between the system and the adverse decision. Clearly, the cases require more. The upshot of granting Plaintiff's request based on this argument would be that any and all decisions by any and all ALJ's under the SSA between June 2019 and July 2021 must be reheard. In light of the clear nexus requirement from the Supreme Court and Ninth Circuit, Plaintiff has failed to demonstrate that such a drastic remedy is required.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner of Social Security is **AFFIRMED**. The Plaintiff's Motion for Summary Judgment (Doc. 20) is **DENIED**.

/ / /

**IT IS FURTHER ORDERED** directing the Clerk to enter final judgment consistent with this Order and to terminate this case.

Dated this 9th day of March, 2023.

_G. Murray Snow_
G. Murray Snow
Chief United States District Judge